UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

JEANNETTE CHAMBERS,
    Plaintiff,

-vs-                                    CASE NO. 2:09-cv-643-FtM-DNF

MICHAEL ASTRUE, Commissioner
of Social Security,
    Defendant.
_____/

### OPINION AND ORDER[1]

Plaintiff, JEANNETTE CHAMBERS, appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for social security disability, disability insurance benefits (sections 216(I) and 223 of the Social Security Act) and Supplemental Security Income (1614(a)(3)(A) of the Social Security Act).[2]

Plaintiff filed applications for a Period of Disability and Disability Insurance Benefits and Supplemental Security Income (SSI) on December 14, 2005; alleging an onset date of February 7, 2005 (Tr. 12, 66). Plaintiff meets insured status through December 31, 2010 (Tr. 12, Finding no. 1). In both applications, Plaintiff alleged disability beginning February 7, 2005. These claims were denied initially on May 9, 2006, and upon

---

[1]     Both parties have consented to the exercise of jurisdiction by a magistrate judge, and the case has been referred to the undersigned by an Order of Reference signed by District Judge John E. Steele on December 23, 2009. (Tr. 13).

[2]     Because the disability definitions for DIB and SSI benefits are identical, cases under one statute are persuasive as to the other. *Patterson v. Bowen*, 799 F.2d 1455, 1456 n.1 (11th Cir 1986); *McCruter v. Bowen*, 791 F.2d 1544, 1545 n.2 (11th Cir. 1986).

reconsideration on October 26, 2006. Plaintiff filed a written request for hearing on November 13, 2006. On January 6, 2009, Administrative Law Judge Jennifer B. Millington held a video hearing from Fort Lauderdale, Florida (Tr. 12-18). On January 27, 2009, the ALJ issued an unfavorable decision. Plaintiff filed a Request for Review of the Hearing Decision by the Appeals Council on March 2, 2009 (with an accompanying letter brief) (Tr. 5-8). The Appeals Council denied Plaintiff's request for review on September 9, 2009 (Tr. 2-4). The ALJ's decision became the final decision of the Commissioner. Under 42 U.S.C. § 405(g), Plaintiff requests judicial review of the Commissioner's final decision.

The Commissioner has filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties have filed their legal memorandums. For the reasons set forth below, the Court finds that the Commissioner's decision is due to be **AFFIRMED**.

## I.   Social Security Act Eligibility, the ALJ Decision, and Standard of Review

Plaintiff is entitled to disability benefits when he is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423 (d) (1)(A); 1382c(a)(3)(A). The Commissioner has established a five-step sequential evaluation process for determining whether Plaintiff is disabled and therefore entitled to benefits. *See* 20 C.F.R. § 416.920(a)-(f); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

On December 14, 2005, Plaintiff filed an application for disability, disability insurance benefits and an application for Supplemental Security Income, asserting a disability onset date of February 7, 2005 (Tr. 66). Plaintiff's applications were denied initially, and she has exhausted her administrative remedies. Plaintiff's earnings record shows that she has acquired sufficient quarters of coverage to remain insured through December 31, 2010. (Tr. 12). Plaintiff must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

The Decision of ALJ Millington dated January 27, 2009, denied Plaintiff's claims for disability, disability insurance benefits and found Plaintiff not eligible for Supplemental Security Income (Tr. 18). At Step 1 the ALJ found Plaintiff had not engaged in substantial gainful activity since February 7, 2005, the alleged onset date (Tr. 12). At Step 2 the ALJ found Plaintiff has the following severe impairments: internal derangement of the left knee, osteoarthritis of the left knee and diabetes (20 404.1521 and 416.921). At Step 3 the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 14). At Step 4 the ALJ determined Plaintiff has the residual functional capacity ("RFC") to perform a full range of sedentary work (except she is limited to lifting five pounds occasionally). (Plaintiff cannot climb ladders, ropes or scaffolds, but can occasionally climb stairs, stoop, kneel, crouch and crawl) (Tr. 15 ). Further, the ALJ found Plaintiff's mental impairment of generalized anxiety disorder and effective disorder to be "non-severe." (Tr. 14). At Step 5 the ALJ found Plaintiff is capable of performing her past relevant work as a data entry clerk as this work does not require the performance of work

related activities precluded by Plaintiff's residual functional capacity "RFC" (Tr. 17).

## II. Review of Facts and Conclusions of Law

### Background Facts:

Plaintiff was born on May 12, 1963, and was 45 years old on January 27, 2009, the date of the ALJ's hearing decision (Tr. 9, 81). Plaintiff attended school until the tenth grade and never obtained her GED (Tr. 362, 375). Plaintiff received training from a travel school and training when she worked for Budget-Rent-A-Car. Prior to her alleged disability onset date, Plaintiff worked as a front desk clerk, a pharmacy technician, an assistant manager at a retail store, an order filler, a data entry clerk, and a dry cleaner (Tr. 379-80). Plaintiff alleges that while employed by Dollar General Store she was attending a conference in Tampa on June 23, 2004, and fell landing hard on her left knee.

Plaintiff was examined by Dr. David Ballestas, M.D. on July 1, 2004. Dr. Ballestas observed Plaintiff was limping and was unable to walk without crutches. Dr. Ballestas diagnosed knee sprain/strain and Plaintiff was prescribed Ibuprofen 600 and Vicodin ES and he recommended physical therapy. Plaintiff went for an MRI on July 7, 2004. The MRI revealed degeneration in the left knee, trace effusion and edema around the kneecap. Degenerative loss was also seen along the weight bearing area (Tr. 335, 342).

Plaintiff was seen by Dr. N. Korunda on July 12, 2004, for a "follow-up worker's compensation" visit. Examination and MRI revealed damage to the knee and Dr. Korunda's assessment was "a bruised and sprained left knee with internal damage (Tr. 334)." On July 16, 2004, Plaintiff's records indicate limited range of motion due to pain. Plaintiff's work restrictions were sitting position only, lifting no more than 3 pounds and continuing with

physical therapy. (Tr. 330, 331).

Plaintiff was examined by Dale Greenberg, M.D. on July 21, 2004, for an orthopedic consultation. Dr. Greenburg found swelling of the left knee, some erythema and a healing abrasion. On August 11, 2004, Dr. Greenberg noted that her left knee was doing much better and he expressed the opinion that Plaintiff could "continue to work in the light duty capacity that she has been working for the past few weeks (Tr. 351)."

Plaintiff returned to Dr. Ballesta on July 26, 2004, and his notes indicated Plaintiff had been treated conservatively with physical therapy and non-steroidal anti-inflammatories. Dr. Ballesta limited Plaintiff to no standing or walking for more then one hour a day at work. On August 4, 2004, Plaintiff returned to Dr. Korunda and reported she had re-injured her knee at work and advised Dr. Korunda that they were not honoring her work restrictions at work. Further, Plaintiff complained of burning sensation in her knee and was prescribed Vioxx and a lidoderm patch for pain. A knee brace was prescribed but was not available (Tr. 326-328).

On August 11, 2004, Dr. Greenberg noted Plaintiff's abrasion had healed and she had recovered with full flexion and extension. There was no erythema or instability (Tr. 349).

On September 28, 2004, Plaintiff returned to Dr. Korunda complaining of persistent shooting pain down her leg. Examination revealed pain upon palpation, but there was no swelling. Plaintiff was advised to continue on Vioxx and continue with her knee brace. A note on December 28, 2004, indicated Plaintiff was still having left knee pain. (Tr. 318, 323).

On February 8, 2005, Plaintiff had arthroscopic surgery performed by Dr. John C. Kagan, M.D. Dr. Kagan performed arthroscopic surgery on the chondral defect and debrided her chondromalacia patellae. Plaintiff tolerated the procedure well. (Tr. 302)

On May 24, 2005, Plaintiff returned to Dr. Kagan for pain and swelling in her left knee. Dr. Kagan found Plaintiff was remarkable for patellofemoral crepitance, pain with palpation over the patella and a positive grimace test. Diagnosis was chondromalacia of the left knee with moderate to moderately severe medial compartment osteoarthritis (Tr. 240). Dr. Kagan found Plaintiff to be "pretty debilitated by her knee with pain and inability to function," and advised she should considering having a total knee replacement (Tr. 240). Plaintiff was released to perform sedentary work with a maximum lifting restriction of 10 pounds (Tr. 242).

On August 23, 2005, Dr. Kagan found little change from Plaintiff's previous appointment and again a total knee replacement was discussed (Tr. 238). On June 17, 2005, Plaintiff was again seen by Dr. Kagan for a review of her June 17, 2005 MRI and a follow-up physical examination for pain. Plaintiff was relying on the use of a cane and taking Darvocet. Plaintiff related the Darvocet was not providing relief from pain and any activities exacerbated her pain (Tr. 240). Dr. Kagan noted that the MRI revealed no evidence of tears of the meniscus or ligament damage. It did reveal a "mild tilting of the patella without high-grade chondral defect and there was thinning and erosions within the trochlear groove suggestive of intermediate grade chondromalacia of the patellofemoral joint (Tr. 240)". Dr. Kagan recommended an MRI with gadolinium and for Plaintiff to "remain off work" (Tr. 244).

Plaintiff was seen by Dr. Kagan on September 30, 2005, after tripping in her home and landing on both knees.  X-rays revealed there was no fracture or significant bony abnormality.  Plaintiff was recommended to rest, use ice and elevate both knees.  Plaintiff was advised to call if symptoms worsened (Tr. 237). Diagnostic impressions were contusions on both knees and osteoarthritis of the left knee (Tr. 237).

Plaintiff returned to Dr. Kagan on December 9, 2005, because of severe left knee pain and being unable to walk (Tr. 235).  Dr. Kagan's physical findings remained unchanged.  Plaintiff declined any further injections and Dr. Kagan referred her to Dr. Kenneth Galang, M.D. for pain management.

Dr. Kenneth Galange observed Plaintiff walking with a cane.  Plaintiff related to Dr. Galang that she needed assistance bathing, that her pain was continuous stabbing, burning pain which increased with movement, lying down and worse in the evening.  Plaintiff placed her pain level at a 6 on a 1 to 10 scale (with 10 being the worst pain)  (Tr. 230). Dr. Galange found medial and lateral joint line tenderness.  He found Plaintiff to have full range of motion, no instability of her ligaments and no erythema.  Plaintiff was able to walk heel-to-toe and her gait was steady.  It was noted Plaintiff had endured steroid injections, physical therapy, been on Darvocet for pain and Zoloft for anxiety.  Dr. Galange discontinued Plaintiff's Darvocet and started her on Vicodin/500 and continued the Zoloft (Tr. 233-234).

On February 19, 2006, Plaintiff's blood sugar was over 500.  Plaintiff was admitted to Charlotte Regional Medical Center on February 20, 2006 because she was experiencing polyuria and polydipsia.  It was noted upon admission that Plaintiff was taking Vicodin for her knee problem (Tr. 286).  Lab results showed a blood glucose level of 596, diagnosis:

uncontrolled diabetes and a knee problem (Tr. 286, 287). Plaintiff was discharged with instructions for a "1,800 calorie diabetic diet, Diabeta and Glucophage" (Tr. 288).

On March 11, 2006, James Andriole, a State Agency reviewer completed a Physical Residual Functional Capacity Assessment form ("RFCA") (Tr. 278-285). Mr. Andriole found Plaintiff's "RFC" was consistent with light work with postural limitations. Specifically, Plaintiff could only climb, balance, stoop, kneel, crouch, crawl occasionally and never use ladders, ropes or scaffolds (Tr. 279-280).

Plaintiff was seen by Dr. Kenneth A. Visser, Ph.D., a State Agency examiner on April 17, 2006, for a psychological evaluation. (Tr. 272-277). Plaintiff advised Dr. Visser about her knee injury and how depressed she became after the injury when she tried to return to work. Plaintiff further advised that without working she was unable to continue her knee surgery because she had no funds. (Tr. 273). Plaintiff reported trouble sleeping and could only walk for about one-half of a block and stand only 15 minutes. Plaintiff advised that when she cleaned house that period of cleaning were followed by periods of rest. Plaintiff advised she is able to keep track of her bills and takes care of her personal hygiene. (Tr. 273).

Dr. Visser found Plaintiff to be dressed and groomed appropriately, and that she did not demonstrate any unusual behaviors, and easily made eye contact (Tr. 274). Plaintiff presented information logically and stayed on topic (Tr. 274). Dr. Visser observed that Plaintiff seemed to have "some problem" in her ability to concentrate, but that she had an average general fund of information, normal memory, and average vocabulary and reading abilities (Tr. 275). Under the section entitled "Capabilities," Dr. Visser stated that Plaintiff

8

was able to understand what was presented to her, but had "some difficulty" in her ability to retain information (Tr. 276). Dr. Visser found no issues with Plaintiff's social interaction skills, however, her ability to adapt "seemed low" (Tr.277). Dr. Visser performed the Zung Depression Scale and the Zung Anxiety Scale tests. Plaintiff had elevated results on both, with the anxiety scale being more elevated. "[D]iagnoses: Generalized Anxiety Disorder," "Major Depression, Moderate" and "Adjustment Disorder with Anxiety and Depression." (Tr. 276). Global Assessment of Functioning was at 50.[3] Dr. Visser's prognosis was "guardedly optimistic" because Plaintiff did not have a long history of mental health problems (Tr. 277).

Plaintiff' returned to Dr. Kagan on May 19, 2006. At that time, Dr. Kagan concluded "[S]he can either live with the problem or consider an elective left total knee replacement." (Tr. 227). His notes indicate Plaintiff wanted to have the surgery but her Worker's Compensation carrier was not authorizing the procedure (Tr. 227).

Dr. James Mendelson and Dr. James Brown, two non-examining psychiatric examiners completed Psychiatric Review Technique forms on May 7, 2006 and October 25, 2006, respectively. (Tr. 258-271). Both doctors opined that Plaintiff did not have a severe mental impairment. (Tr. 202, 258). Dr. Mendelson based his opinion on Plaintiff's lack of a prior psychiatric history and lack of any formal psychiatric treatment (Tr. 270). Dr. Brown based his opinion on the fact that there was no "mental worsening" on the petition for

---

[3] GAF 50: Serious symptoms (e.g., suicidal ideation, severe obsesional rituals, frequent shoplifting ) or any serious impairment in social, occupational, or school functioning (i.e., no friends, unable to keep a job.

reconsideration, her activities of daily living and his review of Dr. Visser's evaluation (Tr. 214).

Plaintiff returned to Dr. Galang on July 25, 2006. "[A]ssessment: Pain in the left leg and suboptimal pain control". Dr. Galange maximized Plaintiff's dosage of Lyrica and was contemplating the use of Oxycodone. In November 2006, Plaintiff returned to Dr. Galang and reported her pain was still a "10", but that the Lyrica was reducing it down to a "7". (Tr. 178).

Plaintiff was seen by Dr. Edward Holifield, M.D. on October 9, 2006. Dr. Holifield, a non-examining reviewer completed a Physical Residual Functional Capacity Assessment which indicted Plaintiff was capable of performing light work without any restrictions including the postural ones (Tr. 17-18). Dr. Holifield indicated he made his opinion without benefit of a treating source statement regarding Plaintiff's capabilities in the file (Tr. 222).

Plaintiff was seen by Dr. Michael D. Mozzetti on November 4, 2008, with reported numbness in the right and left leg. Plaintiff had difficulty bending, getting in and out of a chair, problems with sitting and weight bearing (Tr. 191). Plaintiff's gait and station were normal and her muscle strength and coordination were good. "[D]iagnosis: Osteoarthritis, Acute Sciatic, Possible diabetic neuropathy." The Vicodin was discontinued and replaced with Percocet. Plaintiff was advised to apply moist heat 4 times a day. Work restrictions involved lifting "no more than 5 pounds and that was with using both hands". (Tr. 192).

An MRI of the lumbar spine November 15, 2008, revealed degenerative disc disease. (Tr. 180). Dr. Mozzetti noted Plaintiff's difficulties bending and getting in and out of chairs. Physical examination was remarkable for 5/5 muscle strength in all groups except bilaterally

10

in her hip abductors, external rotators, internal rotators, flexors and quadriceps where her strength was diminished (Tr. 181). He continued Plaintiff on Vicodin, moist heat and a five pound lifting restriction.

Dr. Mozzetti completed a Physical Capacities Evaluation form on December 30, 2008. He found Plaintiff could only stand/walk 1 hour at a time. Plaintiff was limited to sitting 2 hours during an 8 hour day and only 2 hours at a time. Lifting was limited to 5 pounds, and "there should be no lifting during a work day". Plaintiff was not to engage in repetitive movements with her feet. Dr. Mozzetti referenced Plaintiff's initial injury and stated that because of her back problem she would only be able to perform "light duty" and again, no lifting over 5 pounds. Further, Plaintiff would need physical therapy [Tr. 197].

**B.     SPECIFIC ISSUES:**

**(1)     THE ALJ'S FAILED TO DISCUSS ALL THE MEDICAL
          EVIDENCE OF RECORD AND FAILED TO ASSIGN
          ANY WEIGHT TO TWO MEDICAL OPINIONS**

Plaintiff argues that the ALJ erred in determining that her mental impairments were not severe at step two of the sequential evaluation process because the ALJ failed to discuss or assign weight to the report of Dr. Kenneth Visser, a consultative psychological examiner. The record documents the ALJ did rely upon Dr. Visser's report in her step two analysis. The ALJ gave great weight to the opinions of the state agency psychological consultants, who based their opinions largely on Dr. Visser's objective clinical findings.

Dr. Visser evaluated Plaintiff on April 18, 2006 (Tr. 272-77). Dr. Visser did not identify any mental limitations resulting from Plaintiff's depression and anxiety. Dr. Visser observed that Plaintiff seemed to have "some problem" in her ability to concentrate, but she

11

had an average general fund of information, normal memory, average vocabulary and reading abilities (Tr. 275). Dr. Visser found no issues with Plaintiff's social interaction skills, however, her ability to adapt "seemed low" (Tr. 277). Dr. Visser's prognosis was "guardedly optimistic". (Tr. 277).

An impairment is severe only if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a); *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986) (the severity of an impairment is measured in terms of its effect upon a claimant's ability to work). Basic work activities include: (1) certain physical functions; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b), 416.921(b).

An impairment is non-severe if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. *Bridges v. Bowen*, 815 F.2d 622, 625-26 (11th Cir. 1987) (affirming Commissioner's finding that claimant's impairment is non-severe where ALJ concluded that claimant had "mild impairments which are amenable to medical treatment") *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).

The ALJ granted "great weight" to the opinions of two state agency psychological consultants, who both reviewed the record and found that Plaintiff's mental impairments were not severe (Tr. 15, 202, 212, 258, 268). State agency psychological consultants are

considered experts in the Social Security disability programs and their opinions may be entitled to great weight if supported by the evidence in the record. 20 C.F.R. §§ 404.1527 (f)(2)(i), 416.927(f)(2)(i); Social Security Ruling (SSR) 96-6p.

Dr. James Mendelson completed a "PRTF" on May 7, 2006 (Tr. 258-71). Dr. Mendelson found Plaintiff's mental impairment not severe (Tr. 258). Dr. Mendelson concluded that Plaintiff was mildly limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace; and had no episodes of decompensation (Tr. 268). Dr. Mendelson based his opinion that Plaintiff's mental impairments were not severe on Dr. Visser's objective clinical findings (Tr. 270) ("[I]n my judgment, the Mental Status Examination further confirms that the most applicable psychiatric diagnosis fails to exceed the severity level of an Adjustment [disorder] with Mixed Emotional Features characterized by dysphoric and anxious feelings"). Dr. Mendelson also noted Plaintiff had received no formal psychiatric treatment (Tr. 270).

Dr. James Brown completed a "PRTF" on October 25, 2006 (Tr. 202-15). Dr. Brown also found that Plaintiff's affective disorder and anxiety-related disorder were not severe impairments (Tr. 202). Dr. Brown found Plaintiff had no restriction in her activities of daily living; mild difficulties in maintaining social functioning and concentration, persistence, and pace; and no episodes of decompensation (Tr. 212). Dr. Brown noted that Dr. Visser diagnosed moderate depression, generalized anxiety disorder, and adjustment disorder with anxiety and depression (Tr. 214). Dr. Brown noted that Dr. Visser's evaluation demonstrated Plaintiff could think, communicate, and reason within normal limits and these were not severe impairments (Tr. 202).

Plaintiff asserts the ALJ failed to include any discussion of Dr. Visser's opinion. In fact, the ALJ cited statements from Dr. Visser's report in her analysis of whether Plaintiff's mental impairments were severe (Tr. 15). The ALJ concluded Plaintiff had mild limitations in activities of daily living based on her comments to Dr. Visser; that she maintains her own personal hygiene and keeps track of her bills (Tr. 15, 273). The ALJ also cited Dr. Visser's observation that Plaintiff's social interaction skills were appropriate. (Tr. 15).

Furthermore, the ALJ granted significant weight to the opinions of Drs. Mendelson and Brown, who in turn based their conclusions largely on Dr. Visser's objective clinical findings (Tr. 15, 214, 270).

Plaintiff cites language from SSR 96-6p to argue that the ALJ was required to explain the weight given to Dr. Visser's opinion. SSR 96-6p, however, applies only to findings by state agency medical and psychological consultants: "[A]LJ's and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions". State agency psychological consultants are "psychologists who are experts in the evaluation of the medical issues in disability claims under the Act" and "members of the teams that make determinations of disability at the initial and reconsideration levels of the administrative review process."

Dr. Visser is not a state agency psychological consultant — he is an independent consultative examiner engaged by the Commissioner to provide additional evidence regarding Plaintiff's mental impairments (Tr. 127-28, 272). The Commissioner is authorized to purchase a consultative examination when the medical and other evidence is insufficient

to render a decision. 20 C.F.R. §§ 404.1519a(b), 416.919a(b). Thus, the ALJ had no obligation under SSR 96-6p to explain the weight given to Dr. Visser's opinion.

Substantial evidence supports the ALJ's finding of a non-severe mental impairment. Plaintiff has not shown that her mental impairments significantly limit her ability to do basic work activities. The "elevated" results of the Zung Self-Rating Anxiety and Zung Self-Rating Depression Scales and Dr.Visser's diagnosis of generalized anxiety disorder, moderate major depression, and adjustment disorder with anxiety and depression do not, standing alone, establish a severe impairment (Tr. 275-76). The mere existence of impairments "does not reveal the extent to which they limit [a claimant's] ability to work or undermine the ALJ's determination in that regard." *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005).

Likewise, the Global Assessment of Functioning (GAF) score of 50 assigned by Dr. Visser does not compel a finding of a severe mental impairment (Tr. 276). Plaintiff has failed to show that her GAF score reflected any work-related limitations. A GAF score represents an examiner's opinion of an individual's symptoms or possible difficulty in social, occupational, or school functioning. Thus, a GAF score may simply be the examiner's impression of the person's alleged symptoms when seen on a particular day, with no bearing on the person's actual functioning. There is no indication in Dr. Visser's report that the GAF scores were assigned due to Plaintiff's inability to work. *Ward v. Astrue*, No. 00-1137, 2008 WL 1994978, at *3 (M.D. Fla. 2008).

The fact Plaintiff was prescribed Zoloft for anxiety "stemming from her injury" similarly demonstrates nothing about how her mental impairments limited her ability to

work (Tr. 234). *Habib v. Astrue*, No. 09-82, 2010 WL 1048956, at *6 (M.D. Fla. 2010). Indeed, Plaintiff's testimony suggests that her depression was effectively controlled by medication, which is evidence of a non-severe impairment. *Gibbs v. Barnhart*, 130 Fed. Appx. 426, 431 (11th Cir. 2005).

Plaintiff testified at the hearing that she was prescribed Cymbalta and "without it I'm a nervous wreck" (Tr. 376). Yet Plaintiff also testified that she was not taking Cymbalta at the time of the hearing (Tr. 376), which suggests that her mental impairments were not severe. Contrary to Plaintiff's assertion, Dr. Visser's report does not indicate that Plaintiff has any severe mental impairments. 20 C.F.R. §§ 404.1521, 416.921.

### (2) THE ALJ ERRED IN FAILING TO DISCUSS AND WEIGH DR. GALANG'S FINDINGS

Plaintiff argues the ALJ erred in failing to discuss and weigh Dr. Galang's findings. Ordinarily, the Commissioner must give substantial weight to the opinion of a treating physician, unless there is good cause not to do so. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). The ALJ must clearly articulate her reasons for discounting a treating physician's opinion. 20C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). However, the ALJ's failure to assign weight to Dr. Galang's opinion was harmless error because his opinion and findings are entirely consistent with the ALJ's "RFC" and credibility determinations. Furthermore, substantial evidence supports the ALJ's finding that Plaintiff can perform a limited range of sedentary work (Tr. 15).

Plaintiff saw Dr. Galang for an initial consultation on January 27, 2006 (Tr. 229-34). Dr. Galang found no trigger points or tenderness on palpation and no active joint swelling, effusion, warmth, tenderness, or bony deformities (Tr. 232). Dr. Galang found some medial

16

and lateral joint line tenderness, but Plaintiff's range of motion was fully preserved (Tr. 232). Dr. Galang found no sign of ligamentous instability, and noted good symmetry, normal alignment, and full range of motion in Plaintiff's back (Tr. 232). Plaintiff's straight leg raise was normal in both sitting and supine positions (Tr. 232). On May 31, 2006, Dr. Galang noted crepitus in Plaintiff's left knee "but no ligamentous instability" (Tr. 226). On October 30, 2006, Dr. Galang stated that there were "no neuropathic changes" in the lower extremities (Tr. 179). He did not find trigger or tender points and no active joint swelling, effusion, or tenderness (Tr. 179). The findings of Dr. Galang would not support the imposition of limitations in excess of those adopted by the ALJ.

Plaintiff also asserts that the ALJ did not properly evaluate Plaintiff's credibility because she did not consider Dr. Galang's treatment records. When a claimant attempts to establish a disability through subjective complaints of pain or other symptoms, she must show: (1) evidence of underlying medical condition; and (2) either (a) objective medical evidence that confirms the severity of the alleged pain or other symptoms arising from that condition or (b) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain or other symptoms. *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991). The ALJ must articulate explicit and adequate reasons for finding a claimant's subjective complaints of pain or other symptoms not credible and such a finding, if supported by substantial evidence, will not be disturbed by a reviewing court. *Dyer v Barnhart*, 395 F.3d 1206, 20100 (11th Cir. 2005)

The ALJ found that Plaintiff's impairments could reasonably be expected to cause some symptoms, however, her testimony was not credible to the extent that it was

17

inconsistent with the "ALJ'" assessment (Tr. 16). Plaintiff testified that her pain medications provided only moderate relief, and that she is "in agony" after walking fifteen minutes and uses a motorized cart at the grocery store (Tr. 364, 367). Plaintiff stated that she gets up early in the morning to make breakfast, and then has to lie down for several hours (Tr. 365).

The ALJ discounted Plaintiff's subjective complaints based on the opinions of several physicians, who found that she could perform sedentary work with additional restrictions (Tr. 16-17). Dr. Dale Greenberg, who examined Plaintiff soon after her June 2004 injury, opined that Plaintiff could "return to work in a full duty capacity" (Tr. 349). On June 28, 2005, Dr. Kagan released Plaintiff to sedentary duty with a 10 pound maximum lifting restriction (Tr. 242). Dr. Michael Mozzetti, another treating physician, stated that Plaintiff could lift up to five pounds (Tr. 176). The two state agency medical consultants both found that Plaintiff could perform light work (Tr. 216-23, 278-85). Dr. Galang's opinion that Plaintiff could perform sedentary work would not have altered the ALJ's conclusion that Plaintiff's testimony was not credible because it is consistent with the opinions of the other physicians upon which the ALJ relied. Furthermore, while Dr. Galang's treatment notes demonstrate that Plaintiff had a medical condition that caused some pain, they do not confirm that Plaintiff's symptoms were at the level of severity alleged in her testimony (Tr. 178-79, 224, 226, 229-34). Substantial evidence supports the ALJ's conclusion that Plaintiff's testimony concerning her pain and other symptoms was not credible.

### C. CONCLUSION

For the foregoing reasons, the ALJ's decision is consistent with the requirements of

law and supported by substantial evidence. Therefore, based on the application for a period of disability and disability insurance benefits protectively filed on December 14, 2005, Plaintiff is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for Supplemental Security Income protective filed on December 14, 2005, Plaintiff is not disabled under section 1614(a)(3)(A) of the Social Security Act.

Accordingly, the decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter judgment dismissing this case and thereafter, to close the file.

**DONE AND ENTERED** in Chambers at Fort Myers, Florida, this 24th day of March, 2011.

Copies furnished to:

/s/ Douglas N. Frazier
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to:

Susan Roark Waldron, A.U.S.A.
Roberta D. Kusher, Esquire